# EXHIBIT 1

STATE OF MICHIGAN

IN THE WAYNE COUNTY CIRCUIT COURT

Vincent Porter,

    Plaintiff,

v.

Case No.     -CZ
Hon.

National Football League Players Association,

    Defendant.

---

Gerald K. Evelyn (P29182)
Robert E. Higbee (P82739)
Attorneys for Plaintiff
535 Griswold, Suite 1000
Detroit, MI 48226
(313) 962-3500
geraldevelyn@yahoo.com
robhigbee@gmail.com

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

There is no other pending or resolved civil action arising out of the same transaction or occurrence alleged in the complaint.

    /s/Gerald K. Evelyn
    Gerald K. Evelyn (P29182)

Plaintiff, Vincent Porter, by and through his counsel, hereby complains against the above Defendant for the reasons indicated below:

### PARTIES

1. Plaintiff Vincent Porter ("Porter" or "Plaintiff") is an individual who resides in Allen Park, Michigan.

2. The National Football League Players Association ("NFLPA" or "Defendant") is a labor organization representing professional American football players in the National Football

1

League located throughout the United States of America, including members of the Detroit Lions who operate in Wayne County, Michigan.

## VENUE AND JURISDICTION

3. Venue is proper in this forum because the NFLPA conducts business in Wayne County, Michigan, and the NFLPA's actions took effect here, where Porter resided for some or all of the times relevant to the allegations in this Complaint.

4. The Court has personal jurisdiction over the NFLPA, since the NFLPA either resides and/or conducts business in Wayne County, Michigan.

5. The Court has subject matter jurisdiction over this matter because Plaintiff seeks damages in excess of $25,000, exclusive of interest and costs.

## GENERAL ALLEGATIONS

6. Porter has been a Certified Contract Advisor licensed by the NFLPA since 2007. Since that time, Porter worked as a Contract Advisor at two sports management firms (PTA Sports Management and Elevate Sports Management).

7. During that time, Porter represented numerous different NFL players, including but not limited to, Frank Clark, Kyle Nelson, Jordan Kovacs, Brian Tyms, Devon Kennard, Michael Schofield, Rashad Ross, and James Wilder Jr.

8. On October 1, 2014, Porter was charged by way of complaint with one count of Conspiracy to Commit Wire fraud. The Conspiracy to Commit Wire Fraud charge was dismissed and Porter was charged with Misprision. Simultaneous with the charge of Misprision against Porter, Porter and the Government entered into a Deferred Prosecution Agreement that ultimately resulted in the full dismissal with prejudice of any and all charges against Porter.

9. Porter further acknowledged that he had never done business with anyone involved in the October 1, 2014 complaint prior to the purported deal. The facts surrounding the allegations against Porter include but are not limited to the fact that Porter never even executed a document in furtherance of the alleged scheme. Porter was involved in preliminary conversations regarding a business deal that was being proposed by a confidential informant.

10. On February 6, 2015, the NFLPA Committee on Agent Regulation and Discipline ("CARD") filed a disciplinary complaint against Porter pursuant to Section 6 of NFLPA Regulations Governing Contract Advisors ("Regulations"). **Exhibit 1**.

11. Thereafter, the NFLPA indicated it was conducting an investigation into Porter's actions.

12. On September 10, 2015, Porter filed a notice of appeal from the February 6, 2015 disciplinary complaint by CARD. **Exhibit 2**. In the notice, Porter asserted that he was never sent a date for the investigatory interview mentioned in the February 6, 2015 disciplinary complaint. Id. Porter noted that, in response to his March 14, 2015 email regarding a date for the interview, CARD stated in a March 15, 2015 email that it would send him dates "soon;" Porter indicated he had heard nothing after from CARD regarding "an opportunity to address my suspension." Id. Also, Porter was not convicted of a crime but rather had entered into the Deferred Prosecution Agreement that resulted in the dismissal with prejudice of any and all charges against him. Id. Porter denied each of the violations of the NFLPA regulations that had been charged, arguing that CARD based its discipline on illegal actions that never occurred. Id.

13. On October 6, 2015, CARD denied his reinstatement as a Contract Advisor. **Exhibit 3**.

14. On October 12, 2015, Porter replied to CARD's denial. **Exhibit 4**. Porter articulated the reasons why his appeal and petition for reinstatement were sent when they were, including the nature of the suspension being indefinite while being falsely accused of a crime; conversations with CARD in which they told Porter to update CARD on the status of the case and that Porter would have the opportunity to come in and talk to the office but never received that opportunity; it was his understanding that the indefinite nature of the suspension would, at some point in time, become definite and he would have the right to appeal at that time; and, advice from legal counsel. Id.

15. On March 7, 2016, an arbitration hearing was held in Alexandria, Virginia regarding Porter's suspension. By agreement of the parties, certain documents were submitted after the conclusion of the proceedings on March 7, 2016. A transcript was made of the hearing. **Exhibit 5**.

16. The issues in the March 7, 2016, hearing were (1) whether Porter engaged in or was engaging in prohibited conduct alleged by CARD? (2) if so, should the discipline imposed be affirmed or modified? and, (3) whether Porter's appeal was timely?

17. The Arbitrator, Roger P. Kaplan, Esq., held that (1) CARD failed to sustain its burden to prove that Porter engaged in conduct prohibited by the NFLPA Regulations; (2) Porter's suspension was reversed and expunged; and, (3) Porter's appeal was timely.

18. On April 7, 2016, the Southern District of California Court dismissed all charges against Porter. **Exhibit 6**.

19. Subsequent to the dismissal of any and all charges against Porter and the ruling by Arbitrator Kaplan that Porter's suspension by the NFLPA be reversed and expunged, the NFLPA has continued to punish, harass, and interfere with Porter and his business interests.

4

## THE NFLPA'S INAPPROPRIATE USE OF SOCIAL MEDIA

20. The NFLPA used social media, in many different forms including but not limited to Twitter, Instagram and Facebook, to publicize the inappropriate suspension of Porter and to publicly ridicule Porter.

21. More specifically, on February 9, 2015, George Atallah ("Atallah") the assistant executive director of the NFLPA used his personal twitter account to broadcast the news to the world that CARD and the NFLPA had suspended Porter's certification. **Exhibit** 7.

22. Even more specifically, on February 10, 2015, the NFLPA used twitter to communicate to the world that CARD had suspended Porter. **Exhibit 8**. The NFLPA used its official twitter handle or username (@NFLPA) to broadcast a tweet to the world about its suspension of Porter. Id. The NFLPA used the hashtag (#NFLPA) in its post about Porter's suspension. Id. Using hashtags is an intentional attempt to receive more attention from a bigger audience on social media sites or applications such as Twitter.

23. The NFLPA's intentional use of social media to broadcast the news of a suspension that was ultimately reversed and expunged has exponentially affected Porter and Porter's business. The use of twitter and other social media outlets by the NFLPA to report their invalid suspension of him has greatly affected Porter's reputation and ability to conduct business as an NFLPA Contract Advisor or NFL Agent from the time of the use of the social media to the present day.

24. The NFLPA did not use social media to publicize the reinstatement of Porter. After Arbitrator Kaplan ruled in favor of Porter in his appeal of the suspension levied upon him by the NFLPA, the NFLPA did not use social media to publicize Porter's reinstatement.

In fact, the NFLPA did not use social media in any way to acknowledge that its suspension of Porter was ordered to be reversed and expunged by Arbitrator Kaplan.

## NFLPA'S INAPPROPRIATE SECOND INVESTIGATION

25. Subsequent to the dismissal of any and all criminal charges against Porter in California and subsequent to the ruling by Arbitrator Kaplan that Porter's suspension by the NFLPA be reversed and expunged, the NFLPA has continued to punish, harass, and interfere with Porter and his business interests.

26. In an email from Sophie Gage, an Associate Staff Counsel of the NFLPA ("Gage") on August 31, 2016, the NFLPA alleged that they sent Porter a letter requesting that he complete an Authorization to Release Information to Another Person. **Exhibit 9**.

27. The NFLPA alleged that on June 27, 2016, since Porter had not responded to the June 1st, 2016 request, that the NFLPA sent an email further requesting a response that stated:

> To date, you have not responded to either of these inquiries. Should you fail to complete and return the attached authorization to me by Tuesday, September 6, 2016, your continued failure to cooperate with an NFLPA investigation will subject you to discipline. Id.

28. On September 6, 2016, Porter responded to the NFL by email to Gage and Tom DePaso, General Counsel of the NFLPA ("DePaso). **Exhibit 10**. In that email Porter stated that the August 31, 2016 email from Gage was the first communication regarding the authorization that he received from the NFLPA, that he had to consult his attorneys, and that Porter needed until September 12, 2016 to respond to the NFLPA's email. Id.

29. On September 7, 2016, Gage responded to Porter by email stating that Porter "may have until September 12th to submit your response." **Exhibit 11**.

30. On September 12, 2016, Porter responded by email to Gage and DePaso of the NFLPA. **Exhibit 12**. Porter's email response questioned the nature of the NFLPA's investigation

6

and alleged that the NFLPA's ongoing harassment had affected Porter's business and created a lot of emotional distress. Id.

31. On September 14, 2016, Gage responded to Porter stating that the subject matter of the investigation was "the accuracy of your [Porter's] sworn statements during your disciplinary appeal". **Exhibit 13**. The emails from Gage are a clear attempt to harass Porter after an arbitration ruling in Porter's favor and against the NFLPA. It is noteworthy that the investigation never resulted in any action against Porter.

32. On September 16, 2016, Porter responded to Gage and the NFLPA in an email that stated:

> To Whom It May Concern:
>
> Please find attached my response letter to your latest email and my signed certificate of identity, which was required by the NFLPA against my strong objection. I am complying with your requests even though your alleged "investigation" is baseless, retaliatory and an attempt to harm my career and business.
>
> I look forward to hearing from you in the future. **Exhibit 14**.

33. Porter's email included an attached letter that detailed the previous communications between the NFLPA and Porter. **Exhibit 15**. In this letter, Porter detailed the NFLPA's actions and identified the inappropriate actions by the NFLPA. Id. This letter was sent to Gage by email, Joe Briggs of the NFLPA by email, DePaso by email and it was sent by US Postal mail to DeMaurice Smith of the NFLPA.

34. Page three of Porter's letter was the Certification of Identity Form requested by the NFLPA. Id. at pp. 3. Porter complied with the NFLPA's request but he noted that he was submitting the Certification of Identity form over his "strong and viable objection." Id. pp. 2 at ¶ 1.

7

35. The NFLPA's inappropriate second investigation of the same incident that it previously investigated has not resulted in any alleged illegal or inappropriate actions by Porter. The second investigation into Porter by the NFLPA was a witch-hunt intended to intimidate, harass and interfere with Porter and his business.

## NFLPA'S CONTINUED HARASSMENT AND INTENTIONAL INTERFERENCE WITH PORTER AND HIS BUSINESS

36. In an email chain that spanned from August 24, 2018 to October 8, 2018, the NFLPA continued its intentional harassment and interference with Porter's business. **Exhibit 16.** The email chain started with an email from the NFLPA to Porter stating that his status as an NFLPA Licensed Contract Advisor would expire on September 30, 2018 due to Porter's failure to sign an NFL player before the expiration date. Id. at pp. 1. The NFLPA caused the loss of NFL Player client for Porter when they improperly suspended his license. The NFLPA failed to acknowledge the reversal and expungement of Porter's suspension, which has resulted in irreparable harm and Porter having no NFL player clients.

37. On September 4, 2018, Porter responded to the NFLPA stating that they must have made a "mistake or oversight". Id. at pp. 2.

38. Mark Levin ("Levin") from the NFLPA responded on September 4, 2018 stating that the NFLPA would discuss internally and they would get back to Porter. Id. at pp. 3.

39. On September 7, 2018, Porter emailed Levin about the status of the internal discussion because Porter had not heard back from the NFLPA. Id. at pp. 7. Levin did not respond. On September 12, 2018, Porter emailed Levin again stating that he had not heard from the NFLPA. Id. at pp. 8. On September 16, 2018, Porter emailed Levin again communicating his frustrations with the NFLPA and their lack of response. Id. at pp. 11.

40. On September 17, 2018, McPhee emailed Porter and continued the NFLPA's harassment of Porter. Id. at pp. 13. McPhee's email addressed an issue that was already litigated in the arbitration between Porter and the NFLPA. McPhee's email was an intentional attempt to harass Porter.

41. Porter responded to McPhee's inappropriate email on September 19, 2018. Id. at pp. 14. On September 24, 2018, Porter emailed McPhee and Levin to ask about the lack of response from the NFLPA and asking for an answer to Porter's request. Id. at pp. 15.

42. On September 24, 2018, McPhee responded stating that the issues raised by Porter would be raised at the next CARD meeting that takes place during the first week of October. Id. at pp. 16.

43. Porter responded to McPhee by email on October 1, 2018 to ask if Porter would also be able to present information to CARD. Id. at pp. 19. McPhee responded to the email on October 1, 2018. McPhee completely ignored Porter's question regarding his ability to present to CARD and attached a document that McPhee stated was approved and needed Porter's signature and return. Id. at pp. 20.

44. The letter that McPhee attached to the email from the NFLPA to Porter inappropriately asked Porter to release the NFLPA from "any further assertions or claims related to the disposition of the disciplinary matter addressed in NFLPA Case 16-D-1." Id. at pp. 22 ¶4. This letter from McPhee was a strategically planned attempt to get Porter to release the NFLPA due to its inappropriate actions and wrong-doings. The NFLPA, through emails and privately held meetings of its members and CARD, conspired to use an inappropriate action of expiring Porter's license in an attempt to get the NFLPA released from its potential liabilities regarding its previous wrong-doings.

45. On October 8, 2018, Porter responded to McPhee with objections to the NFLPA's request and edits to the document that the NFLPA wanted Porter to sign. Id. at pp. 25-26.

46. From August 2018 to October 2018, the NFLPA intentionally harassed and interfered with Porter and his business. The NFLPA intentionally failed to respond to multiple emails, tried to coerce Porter to sign a document that would release the NFLPA from their previous wrong-doings, and recklessly disregarded Porter's ability to operate his business due the NFLPA's actions.

47. As a direct and proximate result of the NFLPA unjustified suspension of his license, Porter lost all his current clients, any potential for future clients, and at least $2,841,135.60 in damages.

## COUNT ONE—TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY

48. Plaintiff incorporates the preceding paragraphs by reference as though fully set forth herein.

49. At the time he was unjustifiably suspended by Defendant, Porter had valid, existing business relationships with clients, along with the prospect of future business with clients both actual and prospective.

50. Defendant made, or caused to be made, unjustified disciplinary actions by suspending the Plaintiff's license, which interfered with his business expectancy.

51. Defendant had knowledge that its interference would cause Porter to lose his license and therefore, clients.

52. Defendant made, or caused to be made, damage to Porter because his business expectancy was disrupted by the suspension of his license, which resulted in at least $2,841,135.60 in damages.

10

53. Defendant's actions subsequent to Porter's suspension being expunged have also tortuously interfered with Porter's valid, ongoing business expectancies.

WHEREFORE, Plaintiff, Vincent Porter, respectfully request that this Honorable Court enter a judgment agreement with Defendant in excess of $25,000, exclusive of interest and costs, award him reasonable attorney's fees and costs, and any other relief the Court deems just and equitable.

## COUNT TWO—TORTIOUS INTERFERNCE WITH A BUSINESS RELATIONSHIP

54. Plaintiff incorporates the preceding paragraphs by reference as though fully set forth herein.
55. Porter had an existing, valid business relationship with his clients before the unjustified suspension of his license by Defendant.
56. Defendant had knowledge of Porter's relationship with his clients.
57. Defendant intentionally interfered with Porter's license by suspending him without cause and therefore causing a termination of the relationships with his clients.
58. Defendants interference with the Plaintiff's business relationship caused him to lose clients and at least $2,841,135.60 in damages.
59. Defendant's actions subsequent to Porter's suspension have also contributed to tortuously interfering with Porter's valid, ongoing business relationships.

WHEREFORE, Plaintiff, Vincent Porter, respectfully request that this Honorable Court enter a judgment agreement with Defendant in excess of $25,000, exclusive of interest and cost, award him reasonable attorney's fees and costs, and any other relief the Court deems just and equitable.

11

## COUNT THREE—NEGLIGENCE

60. Plaintiff incorporates the preceding paragraphs by reference as though fully set forth herein.

61. Defendant had a duty to not suspend the Plaintiff's license without cause and/or without following its own rules and/or regulations.

62. Defendant was at least negligent in suspending Porter without justification, as confirmed by the ruling of the Arbitrator.

63. As a direct and proximate result of defendant's negligence, Porter lost his clients and at least $2,841,135.00 in damages.

64. Defendant's negligent actions subsequent to Porter's suspension being expunged have also caused harm to Porter.

WHEREFORE, Plaintiff, Vincent Porter, respectfully request that this Honorable Court enter a judgment agreement with Defendant in excess of $25,000, exclusive of interest and cost, award him reasonable attorney's fees and costs, and any other relief the Court deems just and equitable.

## COUNT FOUR—BREACH OF DUTY

65. Plaintiff incorporates the preceding paragraphs by reference as though fully set forth herein.

66. Defendant had the fiduciary duty to engage in a fair disciplinary process and/or to not suspend Porter without just cause and/or to follow its own disciplinary process.

67. Porter's unjustified suspension was a breach of duty.

68. As a direct and proximate result of Defendant's breach, Porter suffered at least $2,841,135.60 in damages.

69. By continuing to interfere with Porter's ability to earn a living, Defendant continues to breach its duty to Porter.

## EXEMPLARY DAMAGES

70. Plaintiff incorporates the preceding paragraphs by reference as though fully set forth herein.

71. Upon information and belief, Plaintiff suffered from humiliation, a sense of outrage, and indignity as a result of injuries maliciously, willfully, and wantonly inflicted by Defendant.

72. Defendant's malicious, willful and wanton conduct includes, but is not limited to:

    a. Unjustly suspending Porter, knowing there was no basis for a suspension and knowing that it would cause great harm to his business interests;

    b. Failure to acknowledge the reversal and expungement of Porter's suspension.

    c. Attempting to coerce Porter into signing a release that would have released Defendant from liability for its past wrongdoing and threatening further disciplinary action if Porter did not comply.

73. Defendant has caused Plaintiff humiliation, outrage and indignation as a result of its malicious, wanton and willful actions, justifying the imposition of exemplary damages.

WHEREFORE, Plaintiff, Vincent Porter, respectfully request that this Honorable Court enter a judgment agreement with Defendant in excess of $25,000, exclusive of interest and

cost, award him reasonable attorney's fees and costs, and any other relief the Court deems just and equitable.

                        Respectfully submitted,

                        s/ Gerald K. Evelyn
                        GERALD K. EVELYN (P29182)
                        ROBERT E. HIGBEE (P82739)
                        Attorney for Plaintiff
                        535 Griswold, Suite 1000
                        Detroit, MI 48226
                        (313) 962-3500
                        geraldevelyn@yahoo.com
                        robhigbee@gmail.com

Dated: November 13, 2019

## PLAINTIFF'S JURY DEMAND

Plaintiff, Vincent Porter, by and through his counsel, hereby demands a jury trial on all claims and issues triable to a jury.

Respectfully submitted,

s/Gerald K. Evelyn
Gerald K. Evelyn (P29182)
Robert E. Higbee (P82739)
Attorneys for Plaintiff
535 Griswold, Suite 1000
Detroit, MI 48226
(313) 962-3500
geraldevelyn@yahoo.com
robhigbee@gmail.com

Dated: November 13, 2019